## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

CHRISTINE KLIMEK,

               Plaintiff,

v.

CENTRACARE HEALTH SYSTEM,

               Defendant.

Case No. 22-cv-3231 (LMP/LIB)

**ORDER GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

---

Alec J. Beck and Jordon Greenlee, **Parker Daniels Kibort, LLC**, **Minneapolis, MN**, for Plaintiff.

Penelope J. Phillips, Sara G. McGrane, and Zachary A. Alter, **Felhaber Larson**, **Minneapolis, MN**, for Defendant.

In August 2021, as health systems throughout Minnesota struggled to cope with the ongoing COVID-19 pandemic, Defendant CentraCare Health System ("CentraCare") implemented a requirement that its employees either be vaccinated against COVID-19 or obtain a valid medical or religious exemption. Employees who either failed or refused to meet these requirements were subject to being placed on unpaid administrative leave. Plaintiff Christine Klimek ("Klimek"), then a nurse working for CentraCare, sought a medical exemption from the vaccination requirement due to a chronic pain condition. CentraCare denied the request because Klimek's medical condition was not considered a contraindication for COVID-19 vaccination. Klimek refused to receive a COVID-19 vaccine, and CentraCare consequently placed Klimek on unpaid administrative leave in December 2021.

Klimek initiated this suit one year later, alleging that CentraCare discriminated against her on the basis of disability and failed to offer a reasonable accommodation in violation of federal and Minnesota law. The parties each moved for summary judgment regarding CentraCare's liability. ECF No. 50; ECF No. 60. For the reasons set forth below, CentraCare's motion for summary judgment is granted, and Klimek's claims are dismissed.

## FACTUAL BACKGROUND

### I.    Klimek's Injury, Diagnosis, and Recovery

Klimek is a registered nurse who began working for CentraCare's acute dialysis unit in 2008. *See* ECF No. 64-1 at 2; ECF No. 56-1 at 22:19–21. In February 2010, Klimek suffered a significant work-related injury to her right arm that caused soft tissue and nerve damage. ECF No. 56-1 at 34:4–35:15. Klimek sought treatment from several specialists and was diagnosed with a chronic pain condition called regional sympathetic dystrophy ("RSD"), which is also referred to as complex regional pain syndrome ("CRPS").[1] *See* ECF No. 71 at 2–6; ECF No. 74 at 2–6; ECF No. 75 at 2–3. Klimek's CRPS causes her to experience pain throughout her body and can be exacerbated by any painful stimulus. ECF No. 56-1 at 45:16–23. Klimek reports that, as it pertains to vaccines, both the poke of the needle and the injection of the vaccine itself can aggravate her condition, *id.* at 166:6–167:6, though she acknowledges that she has not actually received a vaccine since she was diagnosed with CRPS in 2010, *id.* at 44:14–19. Besides generalized pain, Klimek's

---

[1]    The parties use the terms "RSD" and "CRPS" interchangeably throughout the record and in their briefing. *See generally*, ECF No. 52; ECF No. 56-1; ECF No. 62.

condition can cause other symptoms such as nausea and difficulties with memory, concentration, and sleep. *Id.* at 43:8–20; *see also* ECF No. 76 at 2.

In the months after her injury, Klimek tried to manage her CRPS with a variety of treatments, including acupuncture, physical therapy, chiropractic care, cortisone injections, and stellate ganglion procedures, which are anesthetic nerve injections. *Id.* at 37:1–5, 40:6–18, 55:10–56:18; ECF No. 71 at 2–6; ECF No. 76 at 2. Klimek reported to one of her care providers that the stellate ganglion procedures gave her "several days of pain relief" and provided "her best pain relief ever." ECF No. 71 at 3. Klimek also reportedly suffered "stroke-like symptoms" after at least one of these procedures, but those symptoms were "the purpose of" and "an expected side effect from" the injections due to the numbing of the affected nerves. ECF No. 64-9 at 57:9–59:9. Despite the treatments, Klimek's condition worsened, *see* ECF No. 71 at 4, and Klimek ultimately elected to have reconstructive surgery on her injured arm in January 2011, ECF No. 56-1 at 36:4–9. Klimek continued physical therapy after her surgery, but she has not had any nerve injections since. *Id.* at 76:19–77:10.

Klimek worked a reduced schedule of about six to eight hours per week in the time between her injury and surgery, but she returned to full-time work in April 2011, about twelve weeks after her surgery. *Id.* at 37:19–39:7. Klimek continued part time as an acute dialysis nurse and took on a new part-time position as a case manager, *id.* at 39:3–16, a "desk job" that did not require Klimek to do physical tasks that risked aggravating her CRPS, *id.* at 43:25–44:4, and she eventually transitioned full-time to an in-person case manager role in June 2013, *id.* at 29:6–9. Klimek continued to manage her condition with

3

physical and psychological therapy, and by about 2013 or 2014, Klimek was "pretty independent" and managing her CRPS with "prayer, massage, relaxation techniques, meditation, [and] walking . . . six miles every single day." *Id.* at 40:19–41:7.

After returning to full-time work, Klimek was able to perform all her job duties in a "satisfactory or above manner," but she occasionally needed to take a few days off to seek care for acute exacerbations of her CRPS. *Id.* at 41:12–42:5, 44:10–13. Other than requesting a new office chair, Klimek never sought any special accommodations related to her condition from CentraCare until 2016. *See id.* at 43:21–44:9.

## II.    Klimek Receives Medical Exemption for MMR Vaccine in 2016

In June 2016, CentraCare announced a policy requiring employees to receive the measles, mumps, and rubella ("MMR") vaccine or obtain a valid exemption (the "MMR Policy"). *See id.* at 67:8–11. The MMR Policy required employees to submit only a medical provider's statement to obtain an exemption. ECF No. 56-5 at 28:20–23. Dr. Thomas Math, a board-certified infectious disease specialist for CentraCare, was responsible for reviewing and approving exemption requests related to the MMR Policy. ECF No. 56-3 at 10:8–20, 32:3–5.

Citing her CRPS diagnosis, Klimek requested a medical exemption under the MMR Policy in August 2016 and submitted a statement from Dr. Sam Elghor, a physiatrist with whom she consulted after her injury. ECF No. 56-1 at 68:9–23; ECF No. 57 at 2. Klimek "do[es] not recall" whether she was treated by Dr. Elghor after 2010, ECF No. 56-1 at 70:17–71:5, but in his statement, Dr. Elghor explained that "a painful stimulus like a vaccine" could "flare up" Klimek's CRPS and that "the risks of a vaccine seem to outweigh

4

the benefits" considering Klimek's condition.  ECF No. 57 at 2.  Dr. Elghor advised that Klimek "refrain from accepting the MMR vaccination to avoid possible complications." *Id.*

Dr. Math granted Klimek's request, ECF No. 56-3 at 41:13–16, and CentraCare permanently exempted Klimek from any requirement to receive "live vaccinations"[2] for as long as Klimek was being treated for CRPS, *see* ECF No. 56-6 at 2.

### III.    COVID-19 Pandemic Begins

In March 2020, the World Health Organization declared COVID-19 a pandemic.[3] As COVID-19 cases surged through 2020 and 2021, CentraCare was overwhelmed by the concomitant spikes in COVID-19-related hospitalizations and deaths among the central Minnesota communities it serves.  *See* ECF No. 56-7 at 2–6; ECF No. 56-1 at 84:4–25.  As of September 7, 2021—during "the height of the COVID pandemic," ECF No. 56-1 at 84:12–14—CentraCare's hospitals had fifty-one COVID-19 patients, eighteen of whom were admitted to an intensive care unit ("ICU") and nine of whom required ventilators to breathe.  ECF No. 56-7 at 3.  On that same date, only seven ICU beds were available in hospitals throughout all of Minnesota.  *Id.*  And for the week of September 5 to

---

[2]    "Live" or "live-attenuated" vaccines are those that "contain living bacteria or viruses."  *Explaining How Vaccines Work*, U.S. Ctrs. for Disease Control & Prevention (Aug. 10, 2024), https://www.cdc.gov/vaccines/basics/explaining-how-vaccines-work.html [https://perma.cc/W6JX-VQMJ].  By contrast, "non-live" vaccines, as the name suggests, do not contain living bacteria or viruses.  *Id.*  The MMR vaccine is a live-attenuated vaccine.  *Id.*

[3]    *CDC Museum COVID-19 Timeline*, U.S. Ctrs. for Disease Control & Prevention, https://www.cdc.gov/museum/timeline/covid19.html [https://perma.cc/5XJZ-QTST].

September 11, 2021, the United States Centers for Disease Control and Prevention ("CDC") reports 73,466 deaths attributed to COVID-19 in the United States, more than the total number of deaths attributed to any other underlying cause combined. Farida B. Ahmad et al., U.S. Ctrs. for Disease Control & Prevention, *Provisional Mortality Data – United States, 2021*, 71(17) Morbidity & Mortality Wkly. Rep. 597, 597, 599 fig. 1 (Apr. 29, 2022).[4]

After the pandemic began, Minnesota Governor Tim Walz issued an emergency executive order requiring, among other things, that "[a]ny worker who [could] work from home" do so. Minn. Emergency Exec. Ord. No. 20-48 ("Order 20-48") at 3 (Apr. 30, 2020).[5] Klimek was considered "essential frontline staff" for CentraCare, ECF No. 56-1 at 74:1–11, and thus was not subject to Order 20-48. *See* Order 20-48 at 7–8. Other CentraCare employees who were subject to Order 20-48 worked remotely, but when CentraCare experienced staffing shortages due to surges like the one described above, those with nursing skills and other frontline experience were asked to assist with in-person patient care. *See* ECF No. 52 at 9–10; ECF No. 56-4 at 153:9–21.

In November 2020, Klimek contracted COVID-19 while working at CentraCare's St. Cloud Hospital. *See id.* at 70:7–11, 79:23–80:11. Klimek began working remotely after contracting COVID-19, but she experienced severe symptoms that persisted for several

---

[4]    The report can be found at: https://www.cdc.gov/mmwr/volumes/71/wr/pdfs/ mm7117e1-H.pdf [https://perma.cc/5VTC-PUJH].

[5]    Order 20-48 can be found at: https://mn.gov/governor/assets/EO%2020-48%20Final_tcm1055-430499.pdf [https://perma.cc/F9P2-UDVU].

weeks. *Id.* at 71:16–72:17. Klimek did not ask for any time off while she dealt with her COVID-19 infection because CentraCare was "very short staffed" at the time due to the number of COVID-19 patients "being so high," but a colleague eventually "ordered" her to take two days off because she "was so sick." *Id.* at 71:16–23, 79:9–17. Because of the severity and duration of her symptoms, Klimek underwent a venous blood draw for a laboratory test. ECF No. 57-1 at 5. No complications related to her CRPS were noted in her medical documentation as a result of the blood draw. *See generally id.* Klimek underwent another venous blood draw in August 2021 for a medical condition that was not related to either her CRPS diagnosis or her COVID-19 symptoms, again with no documented complications. *See generally* ECF No. 57-2.

In May 2021, Klimek transitioned to a new role as a clinical documentation nurse, ECF No. 56-12 at 2, a fully remote position in which she provided support for providers practicing in five CentraCare clinics, ECF No. 56-1 at 29:10–30:7. Klimek applied for the new role because she "needed a change" after nearly two years of working as a nurse through her second pandemic (including the 2009–2011 H1N1 pandemic), and the new role provided flexibility for Klimek to move closer to her elderly parents and assist with their care. *Id.* at 30:8–18.

## IV.    CentraCare Announces COVID-19 Vaccination Requirement

In the summer of 2021, with full Food and Drug Administration approval of a COVID-19 vaccine approaching, more than fifty healthcare associations and industry groups released a joint statement encouraging healthcare systems to require their employees to receive a COVID-19 vaccine. *See* ECF No. 56-8 at 2–4. On August 23,

7

2021, CentraCare announced a requirement that all staff either receive a COVID-19 vaccine or obtain an approved medical or religious exemption (the "COVID-19 Policy"). ECF No. 56-9 at 2–3; *see also* ECF No. 56-10 at 2–5.  CentraCare's stated goal for the COVID-19 Policy was to "minimize transmission" of COVID-19, "to serve and care for [CentraCare's] patients, to help protect [its] communities, and to provide for the safety, security, and health of [its] employees and other staff."  ECF No. 56-10 at 2; *see also* ECF No. 56-4 at 116:23–117:4.  CentraCare expressly stated that compliance with the COVID-19 Policy was "a condition of employment."  ECF No. 56-10 at 3.

Under the COVID-19 Policy, CentraCare employees who did not request or receive an exemption were required to provide proof of having received a full COVID-19 vaccine course by December 15, 2021.  *Id.* at 2–3.  Unlike medical exemption requests under the MMR Policy, which required only a medical provider's statement advising that an employee should not receive a vaccine, ECF No. 56-5 at 28:20–23, medical exemption requests under the COVID-19 Policy required employees to submit "physician documentation for a diagnosis considered to be a contraindication for COVID-19 vaccination," ECF No. 56-9 at 3.  The requester's medical provider was also required to complete part of the request form.  ECF No. 56-11 at 3.  Requests for medical exemptions were to be "decided on a case-by-case basis based only upon the documents submitted by the requesting person."  ECF No. 56-10 at 4.

Once an individual submitted a medical exemption request, including any supporting documentation, a CentraCare physician on its Exemption Review Board ("ERB") would review the request.  ECF No. 56-3 at 14:24–15:13.  As relevant here,

members of the ERB included Dr. Thomas Math, who is board-certified in infectious disease and internal medicine and was the physician who approved Klimek's MMR exemption, *id.* at 10:8–12, 41:13–16; and Dr. Jill Amsberry, a pediatrician who has experience with vaccinations and was a member of the Minnesota Department of Health's COVID-19 Vaccine Allocation Advisory Committee, ECF No. 56-2 at 33:9–34:17. If the initial reviewer approved the exemption, the requesting employee was notified, and the exemption was granted. *See* ECF No. 56-3 at 15:25–16:3. If the initial reviewer denied the exemption request, it was reviewed by a second member of the ERB to ensure the accuracy of the first review. ECF No. 56-2 at 64:23–65:2. ERB reviewers largely based their decisions on CDC guidance regarding conditions or diagnoses identified as contraindications for COVID-19 vaccination. *See* ECF No. 55 ¶ 3; ECF No. 56-2 at 44:4–9. As of December 17, 2021, the CDC had identified only two such contraindications: (1) "[s]evere allergic reaction (e.g., anaphylaxis) after a previous dose or to a component of the COVID-19 vaccine," and (2) "[k]nown diagnosed allergy to a component of the COVID-19 vaccine." ECF No. 56-13 at 8, 18. In addition, CentraCare indicated medical exemptions would be considered for people who experienced myocarditis or Guillain-Barré syndrome "after the first dose" of a two-dose COVID-19 vaccine. *See* ECF No. 56-11 at 3.

CentraCare staff who failed or refused to comply with the COVID-19 Policy by December 15, 2021, were subject to being "placed on [an] unpaid leave of absence for up to one year." ECF No. 56-10 at 3. Klimek understood the COVID-19 Policy and the consequences for failing to comply with it. *See* ECF No. 56-1 at 88:19–90:13.

9

**V.    CentraCare Denies Klimek's Request for a Medical Exemption Under the COVID-19 Policy**

On August 24, 2021, Klimek forwarded the 2016 communication regarding her MMR exemption to a member of CentraCare's Employee Health Services ("EHS") team. ECF No. 57-3 at 3. Klimek added that she believed her MMR exemption—which conferred a "permanent medical exemption" from receiving "live vaccinations," ECF No. 56-6 at 2—extended to the COVID-19 vaccine, *see* ECF No. 57-3 at 3. The EHS team member informed Klimek that the "COVID vaccine is not a live/attenuated vaccine" and that all employees, including Klimek, had to "submit requests through [the] updated process" outlined in the COVID-19 Policy. *Id.* at 2.

Klimek completed a medical exemption request form as provided by the COVID-19 Policy later that day. *See* ECF No. 57-4 at 2–3. Even after having been informed that the COVID-19 vaccines are not "live" vaccines, Klimek wrote:

> I am medically exempt from any/all live or attenuated vaccinations related to a CentraCare work-related injury resulting in a documented permanent disability and a rare condition, Chronic Regional Pain Syndrome/Reflex Sympathetic Dystrophy. This exemption has been documented and filed in my chart since August 2016. My condition is lifelong, and I manage the negative side effects on a daily basis.

*Id.* at 2 (cleaned up). On the portion of the form reserved for a medical provider's statement, Klimek herself wrote: "My condition is permanent and progressive. Please see the previous physician's documentation and 'Permanent Medical Exemption' letter from Aug. 2016." *Id.* at 3; *see* ECF No. 56-1 at 93:21–25.

The next day, Klimek asked Jennifer Chirhart, a CentraCare nurse practitioner and Klimek's primary care provider at the time, to complete the medical provider portion of

10

the request form.  ECF No. 95:6–23; ECF No. 57-5 at 2.  Chirhart wrote, "Patient has RSD as well as documentation that explains her reaction to all vaccines.  It is not recommended that she get any vaccines due to her RSD."  ECF No. 57-5 at 2.  Chirhart also provided a note which added that Klimek's other care providers had "provided documentation explaining reactions and reasoning why [Klimek] is to be exempt from receiving vaccines."  ECF No. 69 at 2.  Klimek did not submit to CentraCare any of the documentation Chirhart referenced that supported Klimek's assertion that CRPS or RSD were contraindications for COVID-19 vaccination.  *Id.* at 97:11–98:18.

Dr. Math was the first physician to review Klimek's medical exemption request.  ECF No. 55 ¶ 3.  Based on his review, Dr. Math concluded that Klimek had not identified "any condition that, based on [his] clinical judgment and evaluation of CDC guidance, was contraindicated with COVID-19 vaccination" and, as a result, denied Klimek's request.  *Id.*  Consistent with the ERB review process, Dr. Amsberry then performed a second, independent review of Klimek's request.  ECF No. 54 ¶ 3.  Like Dr. Math, Dr. Amsberry also concluded that CRPS or RSD was not a recognized contraindication for COVID-19 vaccination.  ECF No. 56-2 at 94:16–19.  Dr. Amsberry affirmed Dr. Math's denial of Klimek's request, ECF No. 54 ¶ 3, and CentraCare sent a letter to Klimek on October 12, 2021, informing Klimek that her exemption request was denied, ECF No. 56-18 at 2.

Two weeks later, CentraCare sent Klimek a second letter notifying her that, "[o]ut of a need for fairness of the process," employees whose medical exemption requests had been denied would be permitted to provide supplemental medical documentation and resubmit their requests with additional medical documentation.  *Id.* at 3.  Klimek responded

to CentraCare's second letter and provided a more complete explanation of her medical history and the challenges of managing her CRPS. ECF No. 57-7. There, Klimek requested that CentraCare reconsider its denial of her exemption request or otherwise permit her to continue working from home without receiving a COVID-19 vaccine or an exemption. *Id.* at 2–5. Klimek again, however, did not submit any supplemental medical documentation showing that CRPS or RSD was considered a contraindication for COVID-19 vaccination. ECF No. 56-1 at 113:11–14. Klimek believed it was CentraCare's responsibility "to prove that [she], in fact, was safe to receive" a COVID-19 vaccine, and that she only needed to show she had been diagnosed with CRPS and had received advice from a medical professional not to receive the vaccine. *Id.* at 119:7–10.

Dr. Math and Dr. Amsberry each independently reviewed Klimek's medical exemption request a second time and again denied Klimek's request for the same reasons they denied it the first time. ECF No. 55 ¶ 4; ECF No. 54 ¶ 4. On November 16, 2021, CentraCare sent Klimek a letter informing her that her exemption request was denied and that, consistent with the COVID-19 Policy, she would be placed on an unpaid leave of absence if she did not receive a full COVID-19 vaccine course by December 15, 2021. ECF No. 56-19 at 2.

Klimek responded to CentraCare's letter one week later asking for an explanation of its denial of her exemption request. ECF No. 57-8 at 2. On December 3, 2021, CentraCare facilitated a meeting between Klimek and Dr. George Morris, one of CentraCare's COVID-19 response coordinators, to discuss the ERB's decision. ECF No. 56-1 at 113:24–114:8; ECF No. 56-4 at 29:5–7, 129:1–11. Dr. Morris has experience

12

treating patients with CRPS as part of his sports medicine practice. ECF No. 56-4 at 120:10–20. During the meeting, which Klimek recorded, Dr. Morris explained to Klimek that CRPS was not contraindicated for COVID-19 vaccination. *See* ECF No. 56-1 at 114:7–115:23. Dr. Morris sought to clarify why Klimek's request was denied in this instance but had been approved under the MMR Policy. *Id.* And Dr. Morris explained that the changes to the exemption request process were necessary due to the scope and severity of the COVID-19 pandemic. *Id.* at 115:15–116:5. Dr. Morris also offered to extend the deadline for Klimek to comply with the COVID-19 Policy for one month so he could meet with Klimek's care providers to discuss the safety of COVID-19 vaccination for Klimek. *Id.* at 116:21–117:3. Klimek declined Dr. Morris's offer, *id.* at 117:4–7, and documented her recollection of that part of the discussion as follows:

> [Dr. Morris] offered again to meet with any and all of my Providers to discuss the safety and efficacy of me receiving the [COVID-19] vaccination. I explained that as much as I would love to have another month worth of pay . . . I would not feel right leading CentraCare on to think that I was going to agree with taking a vaccination that I know will be detrimental to my health.

ECF No. 57-9 at 8–9.

Due to her noncompliance with the COVID-19 Policy, CentraCare placed Klimek on an unpaid leave of absence on December 15, 2021. ECF No. 56-1 at 168:14–16.

## VI. Klimek Files Suit

After exhausting her administrative remedies and receiving a right-to-sue notice from the Equal Employment Opportunity Commission, Klimek brought this lawsuit. *See* ECF No. 1 ¶ 45. Klimek alleges that CentraCare's refusal to grant her a medical exemption

under the COVID-19 Policy constitutes a failure to accommodate her disability under both the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.08, subd. 6. *Id.* ¶¶ 46–64. CentraCare denies Klimek's allegations and raises several affirmative defenses. *See generally* ECF No. 8. The parties now both move for summary judgment regarding CentraCare's liability under the ADA and MHRA. ECF No. 52 at 2; ECF No. 62 at 1. Klimek also moves for summary judgment regarding CentraCare's "direct threat" affirmative defense. ECF No. 62 at 20–23; *see* ECF No. 8 at 11.

## ANALYSIS

### I.    Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Hustvet v. Allina Health Sys.*, 910 F.3d 399, 406 (8th Cir. 2018). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). When considering a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). But courts "must not weigh evidence or make credibility determinations." *Sanimax USA, LLC v. City of S. St. Paul*, 95 F.4th 551, 558 (8th Cir. 2024) (internal quotation marks omitted) (citation omitted). "[T]he court's

analysis does not change" when considering cross-motions for summary judgment. *Hanson v. Loparex, Inc.*, 809 F. Supp. 2d 972, 977 (D. Minn. 2011).

## II.    Klimek's ADA and MHRA Claims

Both the ADA and the MHRA prohibit employers from discriminating against qualified employees on the basis of disability. *See* 42 U.S.C. § 12112(a); Minn. Stat. § 363A.08, subd. 2; *see also Hustvet*, 910 F.3d at 409. Such discrimination includes failure to provide reasonable accommodations for otherwise qualified employees with known physical or mental limitations. *Hustvet*, 910 F.3d at 409–10. "Claims arising under the MHRA are analyzed using the same standard applied to ADA claims," so courts review the claims simultaneously. *Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1182 (8th Cir. 2019) (cleaned up) (quoting *Philip v. Ford Motor Co.*, 328 F.3d 1020, 1023 n.3 (8th Cir. 2003)). To prevail on her failure-to-accommodate claims, Klimek "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it." *Hopman v. Union Pac. R.R.*, 68 F.4th 394, 396 (8th Cir. 2023) (citation omitted).

In employment discrimination cases where, as here, an employee identifies no direct evidence of discrimination, the employee's claims are analyzed under the *McDonnell Douglas* burden-shifting framework.[6] *Johnson v. Westinghouse Air Brake Techs. Corp.*, 104 F.4th 674, 677 (8th Cir. 2024); *accord McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under the *McDonnell Douglas* framework, to survive CentraCare's

---

[6]    Klimek does not offer any direct evidence of discrimination. *See* ECF No. 62 at 11–18; ECF No. 88 at 2–11.

motion for summary judgment, or to prevail on her own, Klimek "must satisfy a prima facie case of discrimination." *Johnson*, 104 F.4th at 677 (citing *McDonnell Douglas*, 411 U.S. at 802). In other words, summary judgment in favor of CentraCare is proper if Klimek "fails to establish any element of her prima facie case." *Wilking v. County of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998) (citation omitted).

## A.    Disability Discrimination

To establish disability discrimination, Klimek must prove that she (1) has a disability within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) suffered an adverse employment action due to her disability. *Mobley v. St. Luke's Health Sys., Inc.*, 53 F.4th 452, 456 (8th Cir. 2023) (citing *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 482 (8th Cir. 2007)). "[T]he determination of whether an individual is entitled to protection under the ADA should be made as of the time of the employment decision." *Samuels v. Kan. City Mo. Sch. Dist.*, 437 F.3d 797, 802 (8th Cir. 2006) (citation omitted).

### 1.    Disability

"As a threshold matter," the Court begins with determining whether Klimek had a disability within the meaning of the ADA. *Hustvet*, 910 F.3d at 410 (quoting *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 713 (8th Cir. 2003)). A "disability" in the context of the ADA is a "physical or mental impairment that substantially limits[7] one or

---

[7]    The MHRA applies a "less stringent 'materially limits'" standard in determining whether a plaintiff is disabled, but that difference is "of no consequence here." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755–56 & n.4 (8th Cir. 2016) (citation omitted); *accord Brunckhorst*, 914 F.3d at 1182 (quoting *Philip*, 328 F.3d at 1023 n.3) ("[C]laims arising under the MHRA are analyzed using the same standard applied to ADA claims.").

more major life activities of [an] individual" or a "record of such an impairment." 42 U.S.C. § 12102(1)(A)–(B). "Major life activities" include, as relevant here, sleeping, concentrating, thinking, and working, and "the operation of a major bodily function" such as digestive, bowel, neurological, and brain functions. *Id.* § 12102(2). "Whether a disability 'substantially limits' an activity or function is a fact-specific inquiry." *Rinehart v. Weitzell*, 964 F.3d 684, 688 (8th Cir. 2020).

CentraCare does not appear to dispute that Klimek's condition qualifies as a "physical or mental impairment" under the ADA, nor that it impacts one or more of Klimek's "major life activities." *See generally* ECF No. 52 at 20–25. Thus, the disputed issue is whether Klimek's CRPS "substantially limits" any of those "major life activities." *See* 42 U.S.C. § 12102(1)(A)–(B). It is a question of degree.

Klimek cites her deposition testimony and medical records to show the ways in which CRPS affects her. ECF No. 62 at 15–16. Klimek experiences "constant pain" and must "avoid any traumatic contact" on her right side, including minor injuries like "bug bites." *Id.* at 16. Her condition also causes stress, which in turn causes symptoms like "nausea, gastric distress, dry heaves, [and] insomnia." *Id.* When Klimek's CRPS is exacerbated, "her cognitive abilities and moods are severely affected." *Id.* In such instances, Klimek "has been forced to miss work." *Id.* CentraCare, on the other hand, points out that according to Klimek herself, she "was pretty independent" by 2014 and able to perform all of her job duties with only occasional limitations when she experienced an acute exacerbation of her CRPS. ECF No. 52 at 20–22. CentraCare also highlights that Klimek "never had to request an accommodation" after she became a full-time case

manager in 2013 because that role did not require her to perform any duties that might cause an exacerbation of her condition, and that Klimek "was able to perform all of her job duties in a satisfactory or above manner." *Id.* at 21–22.

There is sufficient evidence in the record such that resolving this issue would require the Court to "weigh evidence or make credibility determinations," which it may not do. *Sanimax*, 95 F.4th at 558. Accordingly, the Court finds that there is a genuine issue of material fact as to whether Klimek's condition qualifies as a disability within the meaning of the ADA. *See Anderson*, 477 U.S. at 252. For that reason, Klimek cannot establish a prima facie case of disability discrimination at this stage, and thus she cannot establish a prima facie case of failure to accommodate. *See Mobley*, 53 F.4th at 456. As a result, Klimek's motion for summary judgment as to CentraCare's liability must be denied.[8] *See Johnson*, 104 F.4th at 677.

CentraCare, however, may still prevail on its motion by defeating another element of Klimek's prima facie case, *see Wilking*, 153 F.3d at 873, so the Court proceeds with the analysis assuming, without deciding, that Klimek's CRPS is a disability within the meaning

---

[8]    Klimek's request for summary judgment as to CentraCare's affirmative defense remains viable if CentraCare is unable to defeat an element of her prima facie case. *See Amann v. Old Republic Ins. Co.*, 532 F. Supp. 3d 807, 810 (W.D. Mo. 2021) ("An affirmative defense, by its very nature, is relevant only if the plaintiff establishes that the defendant is otherwise liable—but that does not preclude the Court from assessing summary judgment motions directed at affirmative defenses."). Nonetheless, because CentraCare can defeat an element of Klimek's prima facie case of disability discrimination (as discussed below), the Court need not reach the merits of Klimek's argument regarding CentraCare's "direct threat" affirmative defense.

of the ADA.  The analysis therefore turns to whether Klimek was a "qualified individual."
*Mobley*, 53 F.4th at 456.

### 2.    Qualified Individual

To show that she was a qualified individual under the ADA, Klimek must
demonstrate that she (1) possesses the skill, education, experience, and training the position
requires, and (2) can perform the essential job functions, with or without reasonable
accommodation.  *Id.* (citing *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013)).  The first
step focuses on "credentials," *Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 845 (8th Cir.
2015), while the second step focuses on "the fundamental job duties of the employment
position," 29 C.F.R. § 1630.2(n)(1).

CentraCare does not dispute that Klimek had the skill and experience necessary for
the position she held at the time the COVID-19 Policy went into effect, ECF No. 52 at 23,
so the inquiry turns on whether Klimek could perform the essential functions of the job she
held with or without a reasonable accommodation—medical exemption from the COVID-
19 Policy—at the time she made her request.  *See Mobley*, 53 F.4th at 456; *see also
Samuels*, 437 F.3d at 802.

To determine whether a job function is essential, courts consider several factors
including "the employer's judgment as to which functions are essential" and "written job
descriptions" for the employee's position.  *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d
779, 786 (8th Cir. 2004) (citation omitted); *see also* 29 C.F.R. § 1630.2(n)(3).  Generally,
an employer's judgment as it relates to essential job functions is considered "highly
probative," especially "when staffing is problematic."  *Kammueller*, 383 F.3d at 786

19

(citation omitted).  Still, while "highly probative," such evidence is not "conclusive," so courts also look to how eliminating the job function would impact the employer's business. *Id.* (citation omitted); *see Dropinski v. Douglas County*, 298 F.3d 704, 709 (8th Cir. 2002) (citation omitted) ("[T]he consequence of not requiring [an employee] to perform these functions demonstrates that they are, indeed, essential.").

There is no genuine dispute of material fact that compliance with the COVID-19 Policy was an essential job function.  Klimek acknowledges that September 2021—when the COVID-19 Policy became effective, ECF No. 56-10 at 1—was the "height of the COVID pandemic," and that CentraCare was overwhelmed with COVID-19 patients to the point that it impacted CentraCare's resources and staffing.  ECF No. 56-1 at 84:4–25 ("Q: It was hard to get enough workers to work because there were no beds available and no staff to care for them, correct?  A: Correct.").  And Klimek does not meaningfully dispute that CentraCare called on staff working remotely who had nursing experience, like herself, to assist with in-person patient care when CentraCare experienced these staffing shortages.[9] *See* ECF No. 52 at 9–10; ECF No. 56-4 at 153:9–21.  Faced with the substantial impact that the rising number of COVID-19 cases and hospitalizations had on CentraCare in September 2021, *see* ECF No. 56-7 at 3, CentraCare plainly had an interest in minimizing, to the extent it could, the spread and severity of COVID-19 infection among its staff and

---

[9]    Klimek characterizes this as "counterfactual," ECF No. 62 at 18 n.6, but that is beside the point.  While Klimek herself may not have been called in between September and December 2021, she does not dispute that CentraCare did, in fact, call on nurses like herself to assist when staffing shortages occurred, nor does she dispute that it was possible CentraCare may have called on her in such a situation.

the communities surrounding CentraCare's facilities.  CentraCare, in fact, heeded the guidance from more than fifty healthcare associations and industry groups to require their employees to receive a COVID-19 vaccine.  *See* ECF No. 56-8 at 2–4.  And CentraCare's judgment that implementing the COVID-19 Policy was the best way to ensure it could adequately staff its hospitals and clinics while also protecting the health of its patients and the broader communities it serves is "highly probative."  *Kammueller*, 383 F.3d at 786; *see Biden v. Missouri*, 595 U.S. 87, 93 (2022) ("[E]nsuring that [medical] providers take steps to avoid transmitting a dangerous virus to their patients is consistent with the fundamental principle of the medical profession: first, do no harm.").  As one court soundly explained, "substantial deference must be given to the judgments of a hospital organization struggling to cope with a worldwide pandemic.  And it is emphatically not the role of the federal courts simply to second-guess those judgments, or to substitute its own views for those of trained medical personnel."  *Adams v. Mass Gen. Brigham Inc.*, No. 21-cv-11686-FDS, 2023 WL 6318821, at *1 (D. Mass. Sept. 28, 2023).

Klimek suggests that CentraCare "simply saying that *the vaccine itself* was 'an essential job function' does away with the need to accommodate" an employee's disability because "[i]f someone could not take the [COVID-19] vaccine *for whatever* reason, that person was automatically [] considered 'unqualified.'"  ECF No. 88 at 4 (first emphasis added).  But this mischaracterizes CentraCare's argument, which is that *compliance* with the COVID-19 Policy, which included receiving a medical or religious exemption, was an essential job function.  *See* ECF No. 52 at 23.  In other words, an otherwise qualified employee who had a medical condition or diagnosis that was a contraindication for

COVID-19 vaccination would remain a qualified employee by obtaining a medical exemption under the COVID-19 Policy. *See* ECF No. 56-9 at 3. The fact that Klimek did not have such a condition, and thus could not obtain a medical exemption, does not prove that she was "automatically" considered unqualified, nor does it support Klimek's contention that compliance with the COVID-19 Policy could not be an essential job function.

Klimek also argues that compliance with the COVID-19 Policy could not be an essential job function because CentraCare granted religious exemptions to some employees who requested them. *See* ECF No. 88 at 5–6. But Klimek's attempt to leverage CentraCare's efforts to comply with religious-accommodation law as evidence that compliance with the COVID-19 Policy was not an essential job function is unpersuasive. Again, obtaining an exemption—whether medical or religious—was itself a way for CentraCare employees to comply with the COVID-19 Policy. *See* ECF No. 56-9 at 3. And more obviously, Klimek did not request a religious exemption. There is no "inconsistency" here, as Klimek suggests, ECF No. 88 at 5, because CentraCare evaluated religious exemption requests under different criteria than medical exemption requests. *Compare* ECF No. 56-9 at 3 ("Medical exemptions will be granted to people who can provide physician documentation for a diagnosis considered a contraindication with COVID-19 vaccination."), *with id.* ("Religious exemptions will be considered for sincerely held

religious beliefs.").[10]  Plainly stated, the fact that CentraCare granted religious exemptions to some employees who requested them has no bearing on the issues before this Court.

Having established that compliance with the COVID-19 Policy was an essential job function, the only conclusion is that Klimek's failure to comply with the COVID-19 Policy means she was not qualified for her position without an accommodation.  Thus, the analysis turns to whether Klimek was qualified *with* an accommodation.  To establish that she was qualified for her position with an accommodation, Klimek "must show that [the] desired accommodation is 'reasonable on its face.'"  *Mobley*, 53 F.4th at 456 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)).  To be reasonable, the requested accommodation must relate to her disability.  *Hustvet*, 910 F.3d at 410.

As an initial matter, the Court must clarify that the accommodation at issue is Klimek's requested medical exemption under the COVID-19 Policy.  Throughout her briefing, Klimek raises the fact that the nursing position she held at the time the COVID-19 Policy was implemented was fully remote and suggests that the reasonable accommodation CentraCare failed to offer was for her to continue working from home. *See, e.g.*, ECF No. 62 at 5, 17.  But CentraCare is correct that, in fact, Klimek's requested accommodation was to be medically exempted from receiving a COVID-19 vaccine.  *See* ECF No. 52 at 23.  Indeed, the record shows that the first time Klimek mentioned working

---

[10]    Moreover, religious discrimination claims are analyzed under different standards than disability discrimination claims. *Compare Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110, 1113 (8th Cir. 2024) (identifying prima facie elements for religious discrimination claims), *with Mobley*, 53 F.4th at 456 (identifying prima facie elements for disability discrimination claims).

from home as an "accommodation" was in her letter responding to CentraCare's request for additional medical documentation, *see* ECF No. 57-7 at 4—*after* her request for a medical exemption was denied the first time by two reviewing doctors on CentraCare's ERB, *see* ECF No. 56-18 at 2. And in any event, the COVID-19 Policy applied to *all* CentraCare employees regardless of their role at CentraCare or the location where they worked, which aligns with the stated purpose of the COVID-19 Policy: "to serv[e] the needs of [CentraCare's] patients, *and the communities it serves*." ECF No. 56-10 at 2–3 (emphasis added); *see also* ECF No. 56-4 at 152:20–24. As discussed above, CentraCare had an interest in minimizing the spread and severity of COVID-19 infection not only within its hospitals but also among the communities surrounding CentraCare's facilities to prevent members of those communities from potentially requiring hospitalization, especially given the substantial impacts the COVID-19 pandemic had on its resources and staffing. *See* ECF No. 56-7 at 3; ECF No. 56-1 at 84:4–25. To be sure, a medical exemption, if granted, could have included an agreement or understanding that Klimek would continue working remotely and not be called in to assist during any staffing shortages. *See* ECF No. 56-10 at 4. But the fact remains that a medical exemption under the COVID-19 Policy was the accommodation Klimek requested. *See* ECF No. 57-4 at 2–3; ECF No. 57-5 at 2. And Klimek does not appear to dispute that fact in response to CentraCare's motion. *See* ECF No. 88 at 1 (emphasis added) ("Defendant's brief is instructive, in that every argument it advances is premised on the assertion that Ms. Klimek's requested accommodation (*being excused from receiving the COVID-19 vaccination*) was medically unnecessary.").

24

With that, the Court reaches the decisive determination: Klimek's requested accommodation was not related to her purported disability and therefore was not reasonable. *See Hustvet*, 910 F.3d at 410. To begin, the initial basis for Klimek's request was the previous exemption she received under the MMR Policy, ECF No. 57-3 at 3, which permanently exempted Klimek from any requirement to receive "live" vaccines,[11] ECF No. 56-6 at 2. But the COVID-19 vaccines are not "live" vaccines—a fact that Klimek does not dispute—so the prior exemption under the MMR Policy was not sufficient to obtain a medical exemption under the COVID-19 Policy. *See* ECF No. 57-3 at 2. When Klimek formally requested a medical exemption, she provided only a statement from her primary care provider referring to "documentation that explains her reaction to all

---

[11]    Klimek disputes that the exemption she received under the MMR Policy was limited only to "live" vaccines. ECF No. 62 at 5 n.2; ECF No. 63 ¶ 7. This assertion is clearly contradicted by the record. The August 2016 communication in which CentraCare granted Klimek a medical exemption under the MMR Policy clearly states that Klimek "should not have *live vaccinations*" while she was being treated for CRPS. ECF No. 56-6 at 2 (emphasis added). In fact, the medical exemption CentraCare granted Klimek under the MMR Policy was *broader* than what her treating physician expressly advised. *See* ECF No. 57 at 2 (emphasis added) ("I would advise she refrain from accepting *the MMR vaccination* to avoid possible complications."). Moreover, Klimek herself appears to have understood this when she initially communicated with CentraCare about obtaining a medical exemption under the COVID-19 Policy. *See* ECF No. 57-3 at 3 (emphasis added) ("[P]lease see attached below the documentation . . . regarding my current standing as a 'Permanent Medical Exemption' from any and/or all *live or attenuated* future vaccinations."). Klimek's attempt to frame the limitation of her prior exemption to live vaccines as a "simple error," ECF No. 62 at 5 n.2, is unsupported by the record. And her declaration to that effect cannot create a genuine issue of fact sufficient to survive summary judgment. *See Smith v. Golden China of Red Wing, Inc.*, 987 F.3d 1205, 1209 (8th Cir. 2021) (alteration in original) (citation omitted) ("[I]t is black letter summary judgment law that a conclusory, self-serving affidavit will not defeat an otherwise meritorious summary judgment motion.").

vaccines."  ECF No. 57-5 at 2; *see also* ECF No. 69 at 2.  But Klimek did not include in her request any such medical documentation showing that CRPS was a contraindication for COVID-19 vaccination, *see* ECF No. 56-1 at 113:11–14, which is explicitly what CentraCare required, ECF No. 56-10 at 3.  And when offered a second opportunity to provide such medical documentation, ECF No. 56-18 at 3, Klimek did not do so because, in her view, it was CentraCare's responsibility "to prove that [she], in fact, was safe to receive" a COVID-19 vaccine, ECF No. 56-1 at 119:7–10.

That documentation is also nowhere to be found in the record.  Absent such documentation, CentraCare relied upon CDC guidance in denying Klimek's exemption request, and Klimek does not dispute that CDC guidance did not identify CRPS or RSD as a contraindication for COVID-19 vaccination.  Klimek takes issue with what she characterizes as CentraCare "robotically appl[ying] the CDC contraindication guidance, no matter what condition the applicants suffered."  ECF No. 62 at 19.  But in vaccine exemption cases under the ADA, courts routinely look to CDC guidance to determine whether the CDC recognizes the alleged disability as a contraindication with the vaccine at issue to discern whether a requested exemption—that is, an accommodation—is reasonable.  *See Jacobs v. Mercy Health*, 719 F. Supp. 3d 894, 910–11 (E.D. Mo. 2024) (collecting cases).  Indeed, CDC guidance in this context provides for a consistent, uniform, objective, and fair evaluation of each employee's medical exemption request.  Taken to its logical conclusion, Klimek's argument that an employer cannot rely on CDC contraindication guidance would make it effectively impossible for employers, especially those outside the healthcare field, to implement vaccination requirements without either

retaining medical experts for every single condition an employee might identify as a contraindication or exposing themselves to ADA liability. Simply put, if deferring to CDC guidance on these issues is good enough for the courts, it is good enough for employers like CentraCare. *See id.*

Further, Klimek's suggestion that the CentraCare physicians who denied her request could not properly evaluate it because they did not have experience treating patients with CRPS or RSD, *see* ECF No. 62 at 19–20, ignores that Dr. Morris, with whom Klimek met in December 2021 to discuss the denial of her exemption request, *did* have experience treating patients with CRPS, ECF No. 56-1 at 115:12–23. And drawing on his experience and expertise, Dr. Morris informed Klimek that CRPS was not a contraindication for COVID-19 vaccination. ECF No. 56-1 at 115:12–23.

Importantly, there is substantial evidence in the record that Klimek received treatments and underwent procedures that involved insertions of needles or injections of foreign matter—which Klimek now claims would exacerbate her condition, ECF No. 56-1 at 166:6–168:13—without any indication she suffered any complications related to her CRPS diagnosis.[12] In the year following her injury and diagnosis, Klimek managed her

---

[12]    There are two exceptions early in Klimek's treatment for CRPS, neither of which is helpful to Klimek here. In one instance, Klimek suffered a pneumothorax after a stellate ganglion procedure. ECF No. 71 at 3. A pneumothorax, as relevant here, is an "[a]ccumulation of air or gas in the pleural cavity, occurring as a result of disease or injury." *Pneumothorax*, Am. Heritage Dictionary of the Eng. Language (5th ed. 2011). But there is no indication that complication was related to or expected as a result of Klimek's condition, and regardless, Klimek reported that the procedures provided "her best pain relief ever." ECF No. 71 at 3. Klimek also reportedly experienced "stroke-like symptoms" after each stellate ganglion procedure, but according to Klimek, those symptoms were "the

condition with acupuncture, cortisone injections, and stellate ganglion procedures, ECF No. 76 at 2, each of which requires insertion of one or more needles, and the latter two of which involve injecting foreign matter into a person's body. In fairness, those procedures were intended to treat Klimek's CRPS, and they all occurred more than ten years before Klimek requested an exemption under the COVID-19 Policy. *See id.* But the same cannot be said of the venous blood draws she underwent in the months and days before she submitted her medical exemption request, neither of which was related to Klimek's CRPS. *See generally* ECF No. 57-1; ECF No. 57-2. There is no evidence Klimek suffered any negative side effects or exacerbations of her CRPS related to those invasive procedures.

At bottom, the only evidence Klimek produced to prove that her condition was a contraindication for COVID-19 vaccination are unsupported statements from two medical professionals:[13] one who she "do[es] not recall" if she has seen since 2010, ECF No. 56-1 at 70:17–71:5; and another who gestured vaguely towards "documentation that explains [Klimek's] reaction to all vaccines," ECF No. 57-5 at 2, which Klimek neither provided to CentraCare nor submitted into the record before the Court. Taken together with the CDC guidance proffered by CentraCare and Klimek's medical documentation that *is* in the record, there is no genuine dispute of fact. *See Anderson*, 477 U.S. at 252. Klimek's

---

purpose of" and "an expected side effect from" those procedures due to the numbing of the affected nerves and were not caused by the insertion of the needle itself. *See* ECF No. 64-9 at 57:9–59:9.

[13]    Klimek cites three additional statements from medical providers that she received after her employment with CentraCare ended. *See* ECF No. 62 at 10. None of those statements are relevant here because they were not available to CentraCare "at the time of the employment decision." *Samuels*, 437 F.3d at 802 (citation omitted).

requested accommodation—a medical exemption under the COVID-19 Policy—was not related to her condition and therefore was not reasonable.[14]  *See Hustvet*, 910 F.3d at 410; *Jacobs*, 719 F. Supp. 3d at 910–12 (finding medical vaccination exemption not to be a reasonable accommodation where employee's condition was not a contraindication with COVID-19 vaccination).

Consequently, Klimek cannot show that CentraCare discriminated against her on the basis of disability and, thus, cannot show that CentraCare failed to accommodate her disability.  *See Hopman*, 68 F.4th at 396.  For that reason, summary judgment in CentraCare's favor is appropriate.  *See Johnson*, 104 F.4th at 677.

### B.    Failure to Accommodate

Although the Court need not reach the issue of whether CentraCare failed to accommodate Klimek's disability, a brief discussion is warranted for the sake of thoroughness and to provide context for the medical exemption process.  To establish a prima facie case of failure to accommodate a disability, Klimek must show that CentraCare

---

[14]    This outcome does not change even assuming Klimek's requested accommodation was to continue working from home, as Klimek suggests, *see* ECF No. 62 at 16–18—which, again, Klimek raised for the first time after her medical exemption request had been denied when she was asking CentraCare to reconsider the exemption request, *see* ECF No. 57-7 at 4.  Such an accommodation was not one "that would enable [Klimek] to perform the essential functions of the [] position"—that is, complying with the COVID-19 Policy—"but one[] she perceived would relieve her of those functions."  *Faulkner v. Douglas County*, 906 F.3d 728, 734 (8th Cir. 2018).  But "[a]n employer need not eliminate the essential functions of a job to accommodate" an employee with a disability.  *Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 546 (8th Cir. 2018) (cleaned up) (quoting *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999)).  Under the COVID-19 Policy, Klimek needed to get vaccinated or qualify for a medical exemption.  She did neither.

failed to engage in an interactive process to find a reasonable accommodation by establishing that: (1) CentraCare was aware of her disability; (2) she requested accommodations for her disability; (3) CentraCare did not make a good faith effort to assist her in seeking accommodations; and (4) she could have been reasonably accommodated but for CentraCare's lack of good faith. *Hustvet*, 910 F.3d at 410 (citation omitted); *see also Mobley*, 53 F.4th at 457 (citation omitted) ("[F]or a failure-to-accommodate claim to survive summary judgment, an employee . . . must [] show that [her] employer failed to engage in the interactive process in good faith.").

Assuming, without deciding, Klimek could satisfy the first two elements, she cannot establish the last two because CentraCare demonstrated good faith in at least two ways here. First, CentraCare offered Klimek a second opportunity to provide the medical documentation she and her care providers referenced in her exemption request, ECF No. 56-18 at 3, but she still did not provide that documentation to CentraCare, ECF No. 56-1 at 113:11–14. Even with multiple opportunities, Klimek's submission was insufficient to show she qualified for a medical exemption. Second, CentraCare offered to extend the deadline for Klimek to comply with the COVID-19 Policy and to discuss the safety of COVID-19 vaccination for Klimek with her care providers, which she declined. *Id.* at 116:21–117:3. In Klimek's own written recollection of her December 2021 conversation with Dr. Morris, Klimek stated that she "would not feel right leading CentraCare on to think that [she] was going to agree with taking a vaccination that [she knew would] be detrimental to [her] health." ECF No. 57-9 at 9. While Klimek's candor is commendable, her statement suggests that the only outcome she was willing to accept was a medical

exemption from receiving a COVID-19 vaccine. And even though Klimek believes CentraCare would not have granted her a medical exemption after speaking directly with her care providers, *see* ECF No. 62 at 20, it was Klimek, not CentraCare, who terminated the interactive process and foreclosed any possibility of a different outcome, including further discussion of other potential accommodations. There is accordingly no genuine dispute of material fact as to whether CentraCare made "a good faith effort to assist [Klimek] in seeking accommodations." *Hustvet*, 910 F.3d at 410.

\*                    \*                    \*

The Court truly sympathizes with Klimek's struggles with CRPS and reveres the strength and fortitude she has shown in overcoming them, as well as the professional dedication she has shown in working on the frontlines of two different pandemics. Dedicated medical professionals like Klimek are deserving of our gratitude. But when an employee with a disability requests an accommodation unrelated to that disability, "we do not believe an ADA action may lie." *Hustvet*, 910 F.3d at 411 (citation omitted). Such is the case here, and for that reason, Klimek's claims must be dismissed.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings in this matter, **IT IS HEREBY ORDERED** that:

1.    CentraCare's Motion for Summary Judgment (ECF No. 50) is **GRANTED**;

2.    Klimek's Motion for Summary Judgment (ECF No. 60) is **DENIED**; and

3.    Klimek's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 25, 2025                    *s/Laura M. Provinzino*
                                         Laura M. Provinzino
                                         United States District Judge